1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KEITH D. JOHNSON,

11          Petitioner,                    No. CIV S-06-554 MCE CHS P

12       vs.

13   J. YATES, et al.,

14          Respondents.      FINDINGS AND RECOMMENDATIONS

15   _____/

16                 I.  INTRODUCTION

17          Petitioner Keith Johnson is a state prisoner proceeding pro se with a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. §2254.  Petitioner stands convicted of kidnaping and

19   various sex offenses after a jury trial in the Sacramento County Superior Court, case 01F07872.

20   He is serving an aggregate sentence of 37 years to life.

21          Petitioner raises several grounds for relief, organized as follows for purposes of

22   this opinion: (A) he received ineffective assistance of counsel at trial and on appeal; (B) the

23   prosecution engaged in misconduct that violated his right to a fair trial; (C) the trial judge was

24   impartial or biased; (D) there was insufficient evidence to support the deadly weapon use

25   enhancement applied to each count; and (E) the cumulative effect of these errors deprived him of

26   a fair trial.  Although the petition is lengthy, the bulk of it consists of case law citations.

1

1    Petitioner's claims are mostly conclusory, without necessary supporting factual detail or

2    explanation of the resulting prejudice.  As set forth herein, habeas corpus relief is not warranted.

3                            II.  FACTUAL AND PROCEDURAL BACKGROUND

4                     A fairly detailed background summary is helpful to understanding some of

5    petitioner's allegations, especially those regarding his trial counsel's performance.  The following

6    evidence was adduced at trial.

7                     On October 4, 2001, the 16 year old victim was dropped off for school at about

8    7:20 a.m.  She was a junior at Kennedy High School at the time.  (RT 255-57, 262-65.)  Instead

9    of going to her first class, the victim walked toward her friend Nicky's apartment, which was

10   close by.  (RT 264-65.)  The victim called Nicky from the call box phone at the security gate

11   outside the apartment building so Nicky could "buzz" her through the gate.  (RT 266, 620.)

12   While the victim was talking to Nicky, petitioner approached her and asked if she would help

13   him find an apartment.  (RT 267-68.)  Petitioner stated he was trying to find his girlfriend,

14   supposedly over the objections of her mother.  (RT 268.)  The victim agreed to help.  (RT 268,

15   620.)  She was to knock on the girl's door and ask her to come out so her mother would not see

16   petitioner.  (RT 269.)

17                    Petitioner directed the victim across the street to a different apartment complex.

18   (RT 271-72.)  The victim explained to Nicky over her cell phone what she was doing.  (RT 272.)

19   She followed petitioner to the other complex and, as they arrived, ended her cell phone

20   conversation with Nicky.  (RT 271-73, 621.)  Petitioner pointed up some stairs to an apartment

21   with an open door.  (RT 215-16, 274-75.)  Thinking something was wrong, the victim stopped

22   and began to turn around.  (RT 275.)  Petitioner grabbed her and held a knife to her throat; he

23   told her not to scream or he would kill her.  (RT 276-77.)  Afraid, the victim complied with

24   petitioner's order to go up the stairs and enter the apartment.  (RT 277-78.)

25                    Once inside, petitioner closed the door.  (RT 278.)  He ordered the victim to sit on

26   the couch.  (RT 278.)  When she did not comply, petitioner put the knife to her throat and pushed

1   her into the bedroom.  (RT 279.)  Petitioner wrestled the victim onto the bed and tied her hands

2   behind her back.  (RT 279-80.)   He used her cell phone, and, at one point, answered a call from

3   Nicky and forced the victim say that she was going to get a ride to school later.  (RT 290.)  He

4   also called his sister and made the victim ask his sister if she had any sugar.  (RT 282-84.)

5   Petitioner untied the victim's hands and forced her to accompany him to his sister's apartment,

6   where they retrieved a baby bottle filled with sugar that had been left outside the door.  (RT 285-

7   88.)

8          Returning to the original apartment, petitioner took the victim into the bedroom

9   and told her he was going to "violate" her.  (RT 289.)  Petitioner said, "The least you can do is

10  jerk me off."  (RT 289.)  The victim was afraid and did not respond.  (*Id*.)  Petitioner then told

11  her he was going to tie her up but would let her go if she could free herself.  (RT 290, 292.)  The

12  victim screamed and resisted but he tied her up.  (RT 292.)  She was able to free herself in his

13  presence, but petitioner said he would tie her up again because he had not done it right the first

14  time.  (RT 293-94.)  He said he would teach her a lesson about talking to strangers.  (*Id*.)  The

15  victim again freed herself, and again petitioner retied her.  (Rt 294-95.)  This was repeated

16  several times; petitioner used various items such as duct tape, shoelaces, an electrical cord, a

17  sheet, a dress and socks, to tie, bind, and gag her.  (RT 295-97, 366-72.)

18          The victim acknowledged difficulty remembering the precise sequence of events,

19  but testified that petitioner committed a series of sexual assaults or attempted sexual assaults

20  during their lengthy encounter.  (Lodged Document 1[1] at 4.)  At one point, petitioner threatened

21  her with the knife, removed her pants while her hands were bound, and pushed her onto the bed.

22  (*Id*.)   He then pulled her underwear down partway and looked at her vagina, before pulling her

23  underwear back up.  (*Id*.)  He subsequently touched her thighs, stomach, and breasts.  (*Id*.)

24  /////

25  _____

26     [1] Lodged Document 1 is the unpublished opinion of the California Court of Appeals,
    Third District, case C043104 (December 27, 2004).

                                          3

1    Petitioner blindfolded the victim and rubbed her vagina through her underwear.

2 (Lodged Document 1 at 4.)  She subsequently felt his penis rub against her thigh.  (*Id*.)  She

3 screamed and was able to free her hands and remove the blindfold.  (*Id*.)  Petitioner pulled up his

4 pants, and the victim grabbed the knife he had left on the bed.  (*Id*. at 4-5.)  Petitioner took the

5 knife from her, cutting his hand as he grabbed it by the blade.  (*Id*. at 5.)

6    Petitioner left the bedroom and returned with a towel and a black case which he

7 said contained a gun.  (Lodged Document 1 at 5.)  He threatened to shoot her if she did "that"

8 again.  (*Id*.)  He said there were two bullets: one for her and one for him.  (*Id*.)  Petitioner tied the

9 victim's hands and forcibly inserted his fingers into her vagina.  (*Id*.)  After moving her to

10 another bedroom in the apartment for a short time, petitioner locked her in a closet.  (*Id*.)

11    Several hours later, petitioner let her out of the closet.  (Lodged Document 1 at 5.)

12 He was still armed with the knife.  (*Id*. at 4.)  He tried to force her to orally copulate him, but

13 stopped when she threatened to bite him.  (*Id*.)  He also tried unsuccessfully to have sexual

14 intercourse with her.  (*Id*.)  Eventually, petitioner let the victim leave with her cell phone.  (*Id*.;

15 RT 357-58.)  She immediately ran across the parking lot and called 911.  (RT 358-60.)  It was

16 approximately 2:30 p.m. by the time the she left the apartment.  (RT 362, 823-24, 826-29.)

17    During the subsequent investigation, police officers observed and photographed

18 bruises and redness on the victim's wrists and ankles.  (RT 710-15.)  A plastic bag containing an

19 electrical cord, a white athletic sock, duct tape stuck to two gray socks knotted together, more

20 tape stuck to other socks, a bottle of cognac, a beer can, a wire coat hanger, and a 13 inch kitchen

21 knife was recovered from a nearby dumpster.  (RT 733-39, 746-47, 800-808.)  Officers also

22 recovered physical evidence from a bedroom of the apartment, including shoes without laces, a

23 piece of knotted mesh cloth, an AC adapter with the cord cut off, two black cords, a red cord, a

24 pair of anklet socks bearing the victim's name, and a container of petroleum jelly.  (RT 723-24,

25 733, 740-46, 799-802.)  The victim identified the items, including the knife, as those that she had

26 seen in the apartment and those that petitioner had used to assault her.  (RT 364-75.)

1    Petitioner was convicted by jury of kidnaping, forcible penetration with a foreign

2  object, sexual battery, assault with intent to commit rape, and assault with intent to commit oral

3  copulation.  The jury found true a deadly weapon use enhancement allegation with respect to

4  each count.  Petitioner was sentenced to serve 37 years to life in state prison.

5    II.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

6    An application for writ of habeas corpus by a person in custody under judgment of

7  a state court can be granted only for violations of the Constitution or laws of the United States.

8  28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

9  *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

10  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

11  the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

12  U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

13  AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

14  state court proceedings unless the state court's adjudication of the claim:

15    (1) resulted in a decision that was contrary to, or involved an
    unreasonable application of, clearly established Federal law, as
16    determined by the Supreme Court of the United States; or

17    (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the
18    State court proceeding.

19  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

20  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

21    The "contrary to" and "unreasonable application" clauses of §2254(d)(1) are

22  different.  Under the "contrary to" clause of §2254(d)(1), a federal court sitting in habeas corpus

23  may grant the writ only if the state court arrives at a conclusion opposite to that reached by the

24  Supreme Court on a question of law or if the state court decides the case differently than the

25  Supreme Court has on a set of materially indistinguishable facts.  *Williams*, 529 U.S. at 405.  As

26  the Third Circuit has explained, "it is not sufficient for the petitioner to show merely that his

5

1   interpretation of Supreme Court precedent is more plausible than the state court's; rather, the

2   petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome."

3   *Matteo v. Superintendent*, *SCI Albion*, 171 F.3d 877, 888 (3rd Cir. 1999) (emphasis in original).

4   It is not required that the state court cite the specific controlling test or Supreme Court authority,

5   so long as neither the reasoning nor the result contradict same. *Early v. Packer*, 537 U.S. 3, 8-9

6   (2002).

7         The court may grant relief under the "unreasonable application" clause if the state

8   court correctly identifies the governing legal principle but unreasonably applies it to the facts of

9   the particular case. *Williams*, 529 U.S. at 410. The focus of this inquiry is whether the state

10  court's application of clearly established Federal law is objectively unreasonable. *Id.* "[A]

11  federal habeas court may not issue the writ simply because that court concludes in its

12  independent judgment that the relevant state-court decision applied clearly established federal

13  law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*

14        The court will look to the last reasoned state court decision in determining

15  whether the law applied to a particular claim by the state courts was contrary to the law set forth

16  in the cases of the United States Supreme Court or whether an unreasonable application of such

17  law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S.

18  919 (2003). A court may deny a petition for writ of habeas corpus on the ground that relief is

19  precluded by 28 U.S.C. §2254(d) without addressing the merits of the claim. *Lockyer v.*

20  *Andrade*, 538 U.S. 63, 71 (2003).

21                    III.  ANALYSIS OF THE CLAIMS

22        A.      Ineffective Assistance of Counsel

23        The Sixth Amendment guarantees the effective assistance of counsel. A showing

24  of ineffective assistance of counsel has two components. First, a petitioner must show that,

25  considering all the circumstances, counsel's performance fell below an objective standard of

26  reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). After the acts or

6

1  omissions that are alleged not to have been the result of reasonable professional judgment are

2  identified, it must be determined whether, in light of all the circumstances, counsel's

3  performance was outside the wide range of professionally competent assistance. *Id*. at 690;

4  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In assessing an ineffective assistance of counsel

5  claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of

6  professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (*quoting*

7  *Strickland*, 466 U.S. at 689). In addition, there is a strong presumption that counsel "exercised

8  acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d

9  695, 702 (9th Cir. 1990) (*citing Strickland*, 466 U.S. at 689).

10  The second factor required for a showing of ineffective assistance of counsel is

11  actual prejudice caused by the deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice

12  is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

13  result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a

14  probability sufficient to undermine confidence in the outcome." *Id*.; *see also Williams*, 529 U.S.

15  at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

16  1.  Trial Counsel

17  Pages 3 to 3a (21-22) of the petition set forth a laundry list of 32 alleged failures

18  of petitioner's appointed trial attorney, Mr. Mahle. Most of petitioner's allegations in this regard

19  are vague, speculative, and lacking in factual detail. He has failed to demonstrate that trial

20  counsel's performance fell below an objective standard of reasonableness, or that prejudice

21  resulted. To the extent possible, petitioner's specific allegations about counsel's acts and

22  omissions will be addressed.

23  Petitioner first complains that trial counsel was deficient for not attempting to

24  introduce into evidence the personnel records of all police officers involved in the investigation

25  of his case, and particularly those of Officer Bonilla, who took the initial report from the victim.

26  (Pet. at 3a (23).) Apparently, Officer Bonilla's written report indicated that a large black

1   semiautomatic weapon was used in commission of the offenses (Pet. at 3e1 (27)), while the

2   victim testified at trial that she only saw what she believed to be the handle of a gun, and that

3   petitioner never pointed a gun at her.  (RT 314, 450.)  Petitioner suggests that Officer Bonilla

4   fabricated some of the details in his report.

5        The privileges and procedures surrounding motions for discovery of peace officer

6   personnel records are codified in the California Penal Code at sections 832.7 and 832.8 and in the

7   California Evidence Code at sections 1043 through 1045.  A finding of "good cause" for the

8   discovery must be established, including materiality of the information or records sought and

9   reasonable belief that the governmental agency has the type of information or records sought to

10   be disclosed.  Cal. Evid. Code § 1043; *Alford v. Superior Court*, 29 Cal.4th 1033, 1038 (2003).

11   A motion for discovery of peace officer personnel records is addressed to the sound discretion of

12   the trial court.  *Id*.

13        Petitioner does not allege what he expected to find in the police personnel records,

14   how the information would have been material, or how the outcome of his case would have been

15   changed based on the information obtained.  The state superior court correctly rejected this claim

16   for this lack of "detail."  (Lodged Document 6[2] at 2.)

17        Petitioner next complains that trial counsel failed to communicate with and

18   "understand" him. (Pet. at 3k (33).)  But, as the superior court found, he did not provide

19   supporting facts, or demonstrate how he was prejudiced.  (Lodged Document 6 at 2.)  Petitioner

20   further states that a conflict of interest adversely affected trial counsel's performance (Pet. at 3m

21   (35)), but he does not identify the alleged conflict of interest.  Petitioner cites to a portion of the

22   record wherein his attorney discussed with the court a scheduling issue involving a federal trial in

23   which he was involved.  (RT 99-100.)  The issue was apparently worked out and there is no

24   indication in the record that petitioner's representation was adversely affected.

25

26   [2] Lodged document 6 is the unpublished opinion of the Sacramento County Superior
     Court, case 05F09407 (December 6, 2005).

8

1    Petitioner alleges generally that trial counsel failed to introduce any evidence or

2 put on a defense.  He states that the defense case consisted "entirely of cross-examination of the

3 prosecution's witnesses to challenge their credibility."  (Pet. at Intro 4, 3f (20, 28).)  Petitioner

4 also alleges that counsel failed to conduct an investigation or interview witnesses prior to trial.

5 (Pet. at 3 (21).)  He does not, however, identify any specific witnesses counsel failed to interview

6 or investigate, or any testimony or other evidence that should have been presented at trial.  He

7 asserts that he had a meritorious defense, which counsel failed to present, but he does not identify

8 the meritorious defense.[3]  (Pet. at 3e1 (27).)  Once again, petitioner's allegations lack necessary

9 details.

10    A claim of failure to investigate must show what information would have been

11 obtained, and how, assuming the evidence is admissible, it would have produced a different

12 result at trial.  *See Strickland*, 466 U.S. at 694; *Wade v. Calderon*, 29 F.3d 1312, 1316-19 (9th

13 Cir. 1994) (*overruled on other grounds*).  Similarly, a claim of failure to interview or call

14 witnesses is deficient where there is no showing what the interview would have disclosed, what

15 testimony could have been offered, and how it would have changed the outcome of the case.

16 *United States v. Berry*, 814 F.2d 1406, 1409 (1987).  Petitioner's allegations that counsel failed

17 to conduct interviews, investigate, and present a defense are conclusory and insufficient to meet

18 either prong of *Strickland*.  He simply does not allege what more counsel should have done.

19    Petitioner next complains that counsel did not call him to testify at trial, which he

20 alleges is the only way that the victim's damaging testimony could have been disputed.  (Pet at

21 3n (36).)  As the superior court pointed out, however, such a claim is without merit because the

22 decision whether to testify was petitioner's alone to make.  (Lodged Document 6 at 3); *United*

23 *States v. Joelson*, 7 F.3d 174, 177 ( 9th Cir. 1993).  The record does not show that petitioner ever

24 indicated to the trial court that he wished to testify over counsel's objections or advice.  *See*

25

26    [3] Elsewhere in the petition, he states that his activities with the victim were  consensual, however, nowhere does he set forth what counsel could have done to present such a defense.

1  *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993) ("When a defendant is silent in the

2  face of his attorney's decision not to call him as a witness, he has waived his right to testify" and

3  is precluded from premising a claim of ineffective assistance on that ground).  Moreover, once

4  again, petitioner does not set forth what testimony he would have given or how it would have

5  affected the outcome of the trial.

6          Petitioner next complains that counsel should have made a motion for entry of a

7  judgment of acquittal (Cal. Penal Code § 1118.1) at the close of the prosecution's case.  (Pet. at

8  3n-3n1 (36-37).)  A criminal defendant may make such a motion if the evidence presented in the

9  state's case is insufficient as a matter of law.  The standard by which the trial court is to measure

10  the sufficiency of evidence under section 1118.1 inquires "whether the record evidence could

11  reasonably support a finding of guilt beyond a reasonable doubt."  *People v. Johnson*, 26 Cal.3d

12  557, 576 (1980).  The evidence in petitioner's case far exceeded this standard based on the

13  victim's testimony alone.  Corroboration of her testimony was not required.  *People v. Poggi*, 45

14  Cal.3d 306, 326 (1992) ("In California conviction of a sex crime may be sustained upon the

15  uncorroborated testimony of the prosecutrix."); *see also People v. Gammage*, 2 Cal.4th 693, 702

16  (1992) (affirming use of such jury instructions).  Nevertheless the victim's testimony was

17  corroborated.  As the superior court noted, the police found at the apartment and nearby garage

18  dumpster the cords, ropes, cloths, socks, tape and other items described by the victim as those

19  used to bind and gag her; the knife petitioner threatened her with was also recovered.  (RT 364-

20  75, 710-24, 733-47.)  There was no basis for counsel to have moved for acquittal under section

21  1118.1 and certainly no probability that such a motion would have succeeded.

22          Petitioner also alleges that counsel failed to make several other "critical" motions,

23  setting forth a laundry list of virtually every motion that can be made before or during a criminal

24  trial.  (Pet. at 3p-3q (39-40).)  The state superior court correctly noted that petitioner's claim in

25  this regard must be rejected because he

26  /////

1
2
3
4

> fails to give any further detail... of any specific facts surrounding any particular matter, of what trial defense counsel could have introduced, but did not, that would have been reasonably likely to have made a difference in the outcome, or the specific grounds for any particular motion that trial counsel could have [made], but did not, that would have been successful and would have been reasonably likely to have made a difference in the outcome.

5   (Lodged document 6 at 4.)

6        Petitioner next complains that trial counsel did not present expert testimony at

7   trial.  (Pet. at 3s, 3u (42, 44)).  Petitioner does not explain what expert testimony should have

8   been offered, other than to say that it would have been in "the subject area of sexual assault

9   crimes, etc."  (Pet. at 3s (42).)   Petitioner also fails to explain how expert testimony on sexual

10  assault crimes, assuming it would have been admissible, would have been reasonably likely to

11  have caused a more favorable result at trial.

12       Petitioner then asserts that counsel should have objected to the "expert" testimony

13  of Officer Scott Williams because it was "misleading."  (Pet. at 3t (43).)  Officer Williams, a

14  crime scene investigator, testified at trial regarding the photographing and cataloguing of

15  evidence from the crime scene.  (RT 708-25, 733-47.)  He did not testify as an expert and it is not

16  apparent how his testimony, which was subject to thorough cross-examination, was misleading in

17  any way.  Petitioner states only that the testimony "gives one the impression that 'testing' was

18  done" but that "[n]o testing was ever performed or resulted in a match to petitioner.  No physical

19  evidence ties petitioner to any crimes."  (Pet. at 3t (43).)  Petitioner has failed to demonstrate that

20  counsel had a valid basis upon which to object to Williams' testimony.

21       Petitioner states that counsel failed to "move the court for the additional time that

22  is critical to presenting the existing defense."  (Pet. at 3y (48).)  He does not set forth why more

23  time was necessary or what additional defense evidence could have been presented had

24  additional time been allowed.

25       Petitioner next alleges that trial counsel provided ineffective assistance when he

26  failed to have petitioner examined by a psychiatrist "to obtain a report, based on an independent

1   and competent exam, and to assist in the evaluation, preparation, and presentation of the

2   defense." (Pet. at 3z (49).)  Petitioner adds that had such an expert been obtained, he or she

3   could have assisted with the formulation of questions for the prosecution's expert psychiatrist.

4   (Pet. at 3z-3bb (49-51).)  There was, however, no expert witness put on by the prosecution.  As

5   respondent points out, the "mitigating factors" which petitioner states could have been explored,

6   such as childhood and adolescent issues, past traumatic events, positive character, and the like

7   (Pet. at 3aa (50)) are themes commonly developed through mental health expert testimony during

8   the penalty phase of a capital case.  Exploration of these themes would not have been relevant

9   during the guilt phase of petitioner's trial.

10          Petitioner also complains that trial counsel did not present evidence of the

11   victim's mental health records.  (Pet. at 3cc-3ii, 3ll (52-58, 67).)  Under California law, an

12   individual does not place his or her mental health at issue, or lose the right to privacy, simply by

13   raising criminal sexual assault charges against another party.  *Susan S. v. Israels*, 55 Cal.App.4th

14   1290, 1297 (2nd Dist. 1997).  A sexual assault victim's psychological records are not

15   discoverable *pretrial*, but if the direct examination at trial of the victim discloses that such

16   privileged information may be helpful to the defense in cross-examination, the trial court may be

17   called upon to perform and in camera review of the records to determine admissibility.  *People v.*

18   *Hammon*, 15 Cal.4th 1117, 1123-28 (1997); *see also People v. Gurule*, 28 Cal.4th 557, 592-93

19   (2002).   In order for such material to be reviewed by the trial court, the moving party must show

20   good cause.  Good cause in this context means a reasonable likelihood that the documents

21   contain information that is both material and favorable to the defense.  *Hammon*, 15 Cal.4th at

22   1131 (Kennard, J., Conc. & Dis.).

23          The trial record shows that defense counsel moved to obtain and admit into

24   evidence the victim's psychological counseling records.  (CT 121-137, 165; RT 145-75.)  The

25   victim's psychotherapist-patient privacy privilege was invoked.  (RT 150.)  In accordance with

26   state law, admissibility of the records was to be determined after the victim testified.  (CT 132-

137; RT 117-18; 146-48).  After her testimony, trial counsel did not request in camera review, so the mental health records were not examined by the court or admitted into evidence.  (RT 1022-23.)

Petitioner maintains that the sexual activities he engaged in with the victim were consensual.  (Pet. at 3ll (67).)  He speculates that there may have been information helpful to his defense in the victim's mental health records.  But he has failed to point to anything in the her testimony at trial that would have established good cause for trial counsel to request an in camera review of the records by the court.

Good cause for an in camera review of a sexual assault victim's mental health records has been found where there was demonstrated "psychotic or hallucinatory behavior relevant to [the victim's] credibility" (*People v. Reber*, 177 Cal.App.3d 523, 531-32 (3rd Dist. 1986) (*disapproved on other grounds* by *Hammon*, 15 Cal.4th 1117)) and where a five-year old victim "appeared sexually confused and displayed acts of sexually aberrant behavior" (*People v. Caplan*, 193 Cal.App.3d 543, 546, 557) (4th Dist. 1987) (*disapproved on other grounds* by *Hammon*, 15 Cal.4th 1117)).

On the other hand, good cause was not found in *People v. Pack*, 201 Cal.App.3d 679, 685-86 (2nd Dist. 1988), where the defense argued that the victim was "unreliable because of her blood-alcohol level at the time of the incident, her periods of black-out, her inability to recall and place events in proper sequence, and her inconsistent testimony."  The court "decline[d] to review privileged psycotherapeutic records upon such a minimal showing.  A person's credibility is not in question merely because he or she is receiving treatment for a mental health problem."  *Id*. at 686; *see also Hammon*, 15 Cal.4th at 1132 (Kennard, J., Conc. & Dis.) (no good cause shown where there was no reason to suspect that victim would make false accusations of sexual molestation, despite defense's claim that records might contain evidence of victim's propensity to fabricate and fantasize about sexual matters).

/////

1          Thus, the situation in this case is distinguishable from those in the above

2   California cases where psychiatric record reviews were allowed.  Nothing in this record indicates

3   that the victim exhibited aberrant behavior like the victim in *Caplan*.  There was no cause to

4   question her competency, nor any suggestion of psychosis or hallucination like that involved in

5   *Reber*.  On this record, it appears that counsel did not ask the court to review the records because

6   he did not believe that good cause had been shown through her testimony.  In any event,

7   petitioner has once again failed to describe how counsel's performance was deficient, including

8   on what basis the records would have been admissible and how they would have affected the

9   outcome of his case.

10          Petitioner complains that trial counsel did not argue to the jury in his closing

11   argument that the victim could have summoned help if she did not want to go with petitioner into

12   the apartment.  He states:

13          [The victim] voluntarily walked about 1/2 mile with petitioner,
             never called for help, never tried to free herself, and even had a cell
14          phone she was talking on to obtain that help and freedom, if she
             needed it.... When she was at the base of the stairs, she could have
15          [called 911], and thereafter yelled like heck, and ran like heck.  The
             door to Apt. 38 was open but petitioner had not yet taken the cell
16          phone from her!

17   (Pet. at 3uu (76).)  Of course, the victim testified that she voluntarily walked with petitioner to

18   help him find an apartment, and that she did not think anything was wrong until they stopped at

19   the foot of the stairs leading to the apartment with the open door.  (RT 274-75.)  She further

20   testified that upon reaching that point petitioner threatened her with the knife and that she did not

21   scream or otherwise resist then because she was afraid that he was going to kill her.  (RT 275-

22   78.)

23          The Supreme Court has emphasized the deference accorded to trial counsel in

24   making closing argument:

25          ... counsel has wide latitude in deciding how best to represent a
             client, and deference to counsel's tactical decisions in his closing
26          presentation is particularly important because of the broad range of

14

1
2
3
4

> legitimate defense strategy at that stage.  Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact, but which issues to sharpen and how best to clarify them are questions with many reasonable answers... Judicial review of a defense attorney's summation is therefore highly deferential-- and doubly deferential when it is conducted through the lens of a federal habeas.

5   *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (internal citations omitted).

6          The transcript of trial counsel's closing argument is before the court.  (RT 927-

7   969.)  Although counsel did not specifically argue to the jury that the victim could have called

8   911 before she first entered the apartment, he did argue that the evidence showed she could have

9   attempted to summon help or escape at various times in the day, including before they entered

10  the apartment, during the period of time they walked to retrieve the sugar, and when the victim

11  spoke to her friend Nicky on her cell phone in petitioner's presence.  He further argued that some

12  of the victim's actions by her own account demonstrated that she entered and remained in the

13  apartment voluntarily.  Counsel argued vigorously and at length that the prosecution had not

14  proven its case beyond a reasonable doubt and the argument fell within the broad range of

15  professionally competent assistance.

16         Petitioner's final allegations regarding his trial counsel concern voir dire and jury

17  selection.  (Pet. at 3ccc-3fff (84-87).)  First, petitioner alleges that counsel's voir dire strategy

18  was unreasonable since it led to the presence of an Asian woman on the jury, where the young

19  female victim in this case was also Asian.  (Pet. at 3ggg (88).)  Of course, clearly established law

20  set forth by the Supreme Court prohibits such a presumption of bias based solely on a juror's

21  race.  *See Batson v. Kentucky*, 476 U.S. 79 (1986); *People v. Wheeler*, 22 Cal3d 258 (1978).

22         Petitioner also alleges that counsel "failed to make a prima facie showing that [the

23  prosecutor's] peremptory challenge had been exercised on basis of race."  (Pet. at 3iii (90).)  In

24  *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court held that the Equal

25  Protection Clause prohibits a prosecutor from exercising peremptory challenges to strike a venire

26  person on the basis of race.  A criminal defendant can make a prima facie case of purposeful

15

discrimination during voir dire by showing that 'he is a member of a cognizable racial group,' *Batson*, 476 U.S. at 96, and that 'the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race." *McClain v. Prunty*, 217 F.3d 1209, 1219-20 (9th Cir. 2000) (quoting *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000)).  If a prima facie case is made out, "the burden shifts to the State to come forward with a neutral explanation for challenging" the juror in question.  *Batson*, 476 U.S. at 97.  *DeGross*, 960 F.2d at 1442; *Stubbs*, 189 F.3d at 1104.

Here, petitioner alleges that the prosecutor exercised peremptory challenges against two African American individuals on the panel and that no African Americans were seated on the jury.  (Pet. at 3ggg (88).)  Petitioner further asserts that he cannot properly argue his claim that counsel provided ineffective assistance during jury selection because he does not have a transcript of those proceedings.  (Pet. at 3hhh-3kkk (89-90).)  Under California law, voir dire proceedings are excluded from preparation of the reporter's transcript for the normal record of appeal.  *See* Cal. Rules of Ct., Rule 8.320.  As the state superior court noted, a party may seek to expand the reporter's transcript to include voir dire by requesting preparation for appeal.  (Lodged document 6 at 8.)  Petitioner does not indicate that he or his appellate counsel ever requested preparation of the voir dire transcript, nor does he explain what the transcript would show, which would entitle him to relief.

In *Boyd v. Newland*, the Ninth Circuit held that the state courts had violated clearly established federal law by denying a petitioner's *Batson* claim without reviewing a transcript of voir dire.  467 F.3d 1139, 1142-1143 (9th Cir. 2006), *cert. denied*, 550 U.S. 933 (2007) ("without an entire voir dire transcript, those courts could not evaluate the relevant circumstances surrounding the contested strike, as *Batson* requires").  In *Boyd*, the state superior court had denied a *Batson* motion at trial and then denied the defendant's request for a voir dire transcript for use on appeal.  In this case, unlike the situation in *Boyd*, petitioner's trial counsel reportedly did not make a *Batson* objection at trial.  Petitioner's claim is that trial counsel

16

1  provided ineffective assistance.  Even if a transcript of the jury selection proceedings at

2  petitioners trial could be obtained and reviewed, it would not contribute to analyzing his

3  ineffective assistance claim because it would not reveal the race of any of the prospective jurors.

4          Petitioner has not alleged any facts suggesting that the dismissal of either African

5  American juror was based upon race.  Petitioner merely contends that he would be entitled to

6  reversal for counsel's failure to object "*if* the D.A. did not have a race-neutral basis for striking

7  juror(s) in question."  (Pet. at 3iii (90) (emphasis added)).  Petitioner's speculation that

8  discrimination by the prosecutor might possibly have occurred is not sufficient to overcome the

9  *Strickland* presumption that his trial counsel's performance was competent.  *See Strickland*, 466

10  U.S. at 688-89.  In order to present a colorable claim of ineffective assistance of counsel,

11  petitioner must do something more than speculate that there *might* have been a basis for his

12  attorney to make an objection.

13          Also, petitioner cannot demonstrated the necessary prejudice.  "Even where the

14  underlying problem is a structural error like a *Batson* error, a petitioner claiming that his attorney

15  was ineffective for not making the objection must show prejudice under *Strickland*."  *See Gipson*

16  *v. Hubbard*, No. C 06-5463, Slip Op. at 9 (N.D. Cal. Feb. 20, 2009).  That is, a petitioner faulting

17  counsel for failing to raise a *Batson* objection at trial must show a reasonable probability that a

18  different jury would have decided the case differently.  *Young v. Bowersox*, 161 F.3d 1159, 1160

19  (8th Cir. 1998).

20          While the Ninth Circuit has not squarely addressed this issue, it has required

21  prejudice to be shown in this manner in similar situations.  For example, in *Thomas v. Borg*, 159

22  F.3d 1147, 1151-53 (9th Cir. 1998), the court rejected an ineffective assistance of counsel claim

23  based on counsel's failure to assert that there was an under-representation of African Americans

24  in the jury list from which jury venires were assembled.  Although this is different from a *Batson*

25  claim, the *Thomas* court did not presume that there was systematic under-representation but

26  instead considered whether the defendant would be able to demonstrate this and would be able to

1  establish a reasonable probability that the result of the trial would be different if the jury were

2  "perfectly representative of the community." *Id.* at 1152.  After examining the strength of the

3  evidence against petitioner, the court concluded that, in light of the "overwhelming evidence of

4  guilt, it is difficult to see how a different jury would have reached a different result." *Id. Cf.*

5  *Vansickle v. White*, 166 F.3d 953, 959 (9th Cir. 1999) (for counsel's failure to object to a denial

6  of the full allotment of peremptory challenges to constitute ineffective assistance of counsel, the

7  petitioner had to demonstrate a reasonable probability that the outcome of the case would have

8  been different if he had been allowed to use additional peremptories to alter the eventual

9  composition fo the jury; petitioner could not do this because the evidence against him was

10  overwhelming); *but c.f. Williams v. Woodford*, 396 F.3d 1059, 1060 (9th Cir. 2005) (Rawlinson,

11  J., dissenting from denial of rehearing en banc) (analyzing ineffective assistance of counsel claim

12  based on failure to assert a *Batson* claim with the assumption that *Batson* error would have been

13  established if counsel had not failed to object).

14          Even if this case had been tried before a different jury, there is no reasonable

15  probability that the outcome would have been different.  The victim's detailed testimony was

16  corroborated by damaging physical evidence recovered from the apartment, which belonged to

17  petitioner's brother, and additional evidence recovered from a nearby garbage dumpster.  While

18  the overall evidence perhaps fell short of being "overwhelming" with regard to petitioner's guilt,

19  the victim's testimony implicating him in the crimes was, for the most part, undisputed by any

20  other evidence.  In light of the strength of the prosecution's case, it is difficult to see how another

21  jury could have reached a different result.  Petitioner has failed to demonstrate that he received

22  ineffective assistance of counsel at trial.

23          2.      Appellate Counsel

24          The *Strickland* standards apply also to appellate counsel.  *Smith v. Murray*, 477

25  U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).  *Jones v.*

26  *Barnes*, 463 U.S. 745, 751 (1983)  An indigent defendant, however, "does not have a

constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Appellate counsel "must be allowed to decide what issues are to be pressed." *Id*. There is no obligation to raise meritless or weak arguments on a client's behalf. *Miller*, 882 F.2d at 1434; *see also Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice). In order to demonstrate prejudice, a petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. *Id*. at 1434 n.9.

Petitioner alleges that the attorney appointed to represent him on appeal, Ms. Thomas, provided ineffective assistance when she failed to raise on direct appeal the claims set forth in the instant petition. (Pet. at 4a (97).) For the reasons set forth herein, however, any of these claims would have been weak. Counsel's decision not to press them was "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970). Petitioner further alleges that the claims appellate counsel did raise on direct appeal were not set forth "clearly and completely." (Pet. at 4a (97).) He provides no other details. Petitioner's claim that appellate counsel rendered ineffective assistance is without merit. *Strickland*, 466 U.S. 668, 697; *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (conclusory suggestions that a petitioner's appellate counsel provided ineffective assistance fall far short of stating a valid claim of a constitutional violation), *cert. denied*, 116 S.Ct. 1437 (1996).

B. Prosecutorial Misconduct

Petitioner claims that the prosecutor was guilty of misconduct. The standard of review for prosecutorial misconduct is "the narrow one of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). According to the Supreme Court, "the touchstone of a due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). A federal court sitting in habeas corpus must distinguish between "ordinary error of a prosecutor and that sort of egregious

1   misconduct" that "so infected the trial with unfairness as to make the resulting conviction a

2   denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 47-48 (1974).

3           Petitioner first suggests that the prosecutor failed to disclose exculpatory or

4   impeachment evidence in violation of *Brady v. Maryland*.  (Pet. at 3a-3d, 4s-4v (23-25, 117-20).)

5   In *Brady v. Maryland* , the United States Supreme Court held that the suppression before trial of

6   requested evidence favorable to an accused violates due process where the evidence is material

7   either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  373

8   U.S. 83 (1963).  In addition, a prosecutor has a constitutional duty under *Brady*  to disclose any

9   evidence clearly supportive of a claim of innocence, regardless of whether the defense has made

10   a request.  *United States v. Agurs*, 427 U.S. 97, 107 (1976).

11           In the *Brady* context, "evidence is material only if there is a reasonable probability

12   that, had the evidence been disclosed to the defense, the result of the proceeding would have

13   been different."  *Bagley*, 473 U.S. at 682.  Here, petitioner urges that the prosecutor had a duty to

14   disclose from police personnel records any "complaints which may either exculpate petitioner or

15   impeach the police or witnesses" (Pet. at 4u (119)), however he never identifies any specific

16   information or complaints that the prosecutor allegedly failed to disclose.  Petitioner's

17   speculation that exculpatory evidence *might* have existed in law enforcement personnel or other

18   records is insufficient to demonstrate that any material evidence was actually withheld by the

19   prosecution in violation of his constitutional rights.

20           Petitioner alleges that the prosecutor knowingly presented the victim's perjured

21   testimony.  (Pet. at 4k-4l (107-108)).  The knowing use of perjured testimony against a defendant

22   to obtain a conviction is unconstitutional.  *Napue v. Illinois*, 360 U.S. 264 (1959).  In order to

23   succeed on such a claim, a habeas petitioner must first show that some testimony was actually

24   false, and then show that the prosecutor was aware of the falsity.  *Morales v. Woodford*, 336 F.3d

25   1136, 1152 (9th Cir. 2003).  Here, petitioner has not demonstrated the existence of either factor.

26   Review of the trial record demonstrates, at most, possible inconsistencies in the victim's

1   testimony.  Inconsistencies in testimony do not equal untruthfulness (*Price v. Johnston*, 334 U.S.

2   266, 287 (1948) ("it may well be that the witness' subsequent [inconsistent] statements were

3   true..." )), or establish that a prosecutor knowingly presented false testimony.  *Allen v. Woodford*,

4   395 F.3d 979, 995 (9th Cir. 2005).  The crux of petitioner's argument is that the victim's

5   testimony should not be believed.  This is not sufficient to demonstrate a prosecutor's knowing

6   use of perjured testimony.

7        Petitioner asserts that the prosecutor improperly "coached" the victim before trial

8   and during a court recess.  (Pet. at 4k-4l (107-108).)  Petitioner cites to a portion of the record

9   wherein defense counsel was cross-examining the victim regarding her preparation for trial.  (RT

10  378-388.)  The victim testified that she had met with the prosecutor to prepare for trial on at least

11  four occasions, sometimes for several hours at a time.  (RT 379-81.)  She testified that the

12  prosecutor had directed her to say "I don't remember" if she did not remember the answer to a

13  question.  (RT 401.)  Defense counsel also established on cross examination that, after the first

14  day of trial, the victim and the prosecutor discussed details which the victim had  inadvertently

15  forgotten to mention during her initial testimony.  (RT 387-88.)  Defense counsel's cross-

16  examination on this subject was effective, yet did not elicit any evidence of improper "coaching"

17  by the prosecutor.

18       Moreover, a thorough search reveals no Supreme Court or Ninth Circuit precedent

19  on the constitutional boundaries of witness preparation.  There appear to be no clearly established

20  standards for evaluating a prosecutor's preparation of a witness to testify in court.  It is, of

21  course, proper for an attorney to meet with a witness in preparation for trial.  The standard of

22  review for a claim of prosecutor misconduct on a writ of habeas corpus is "the narrow one of due

23  process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Given the lack of precedent,

24  petitioner's vague accusations regarding witness coaching do not demonstrate a due process

25  violation.

26  /////

1        C.      Judicial Bias

2                A criminal defendant has a due process right to a fair and impartial judge.  *In re*

3   *Murchison*, 349 U.S. 133, 136 (1955).  Judicial bias may be shown by demonstrating the judge's

4   actual bias, or by showing that the judge had an incentive to be biased sufficiently strong to

5   overcome the presumption of judicial integrity (i.e., likely bias).  *See Paradis v. Arave*, 20 F.3d

6   950, 958 (9th Cir. 1994).  On habeas corpus review, the relevant inquiry is not whether the trial

7   judge committed judicial misconduct, but rather, "whether the state trial judge's behavior

8   rendered the trial so fundamentally unfair as to violate federal due process under the United

9   States Constitution."  *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995).  Here, petitioner has

10  not offered sufficient evidence to support such a finding.

11               Petitioner contends that the judge's bias is demonstrated by "the time constraints

12  placed on the defense."  (Pet. at 3y (48).)  Petitioner points specifically to the court's denial of

13  trial counsel's motion for a 30 day continuance prior to commencement of trial.  (RT 24-33.)

14  The trial court granted a much briefer continuance after determining that a shorter period of time

15  would be sufficient.  (RT 24-33.)  In the words of the Supreme Court,

16               judicial rulings alone almost never constitute a valid basis for a
                 bias or partiality motion.  In and of themselves (i.e., apart from
17               surrounding comments or accompanying opinion), they cannot
                 possibly show reliance on an extrajudicial source; and can only in
18               the rarest circumstances evidence the degree of favoritism or
                 antagonism required...
19

20  *Liteky v. Unites States*, 510 U.S. 540, 555 (1994) (internal citation omitted).  Petitioner has failed

21  to demonstrate actual or implied judicial bias on the part of the trial judge.

22       D.      Sufficiency of the Evidence

23               Petitioner claims that there was insufficient evidence to support the deadly

24  weapon use enhancement applied to each of his four counts of conviction.

25               On habeas corpus review, sufficient evidence supports a conviction so long as,

26  "after viewing the evidence in the light most favorable to the prosecution, any rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); s*ee also Prantil v. California*, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  As stated by the United States Court of Appeals for the First Circuit, the focus under *Jackson* is not the correctness, but rather, the reasonableness of the state judgement. *See Hurtado v. Tucker*, 245 F.3d 7, 19 (1st Cir. 2001).  The dispositive question is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (*quoting Jackson*, 443 U.S. at 318).

At trial, the jury was properly instructed that:

> A deadly or dangerous weapon means any weapon, instrument or object that is capable of being used to inflict great bodily injury or death, and it can be inferred from the evidence, including the attendant circumstances, namely, the time, place, and any other relevant fact, that the possessor intended on that or those occasions to use it as a weapon should the circumstances so require.
>
> The term "personally used a deadly or dangerous weapon," as used in this instruction, means the defendant must have intentionally displayed a weapon in a menacing manner or intentionally fired it or intentionally struck or hit a human being with it.

(RT at 1028-29.)  Petitioner argues that, in this case,

> [t]he evidence consisted of the uncorroborated testimony of the victim, conclusory statements by the victim, all to include the supposed uncorroborated claim that petitioner used a gun and a knife, for which he was still sentenced.

(Pet. at 3ss (74).)  Petitioner contends that the victim is a liar.  (Pet. at 3tt (75).)  The jury, however, apparently credited her testimony regarding his use of a knife, gun, or both during commission of the offenses.

Under *Jackson*, witness credibility is beyond the scope of this court's review. *Schlup v. Delo*, 513 U.S. 298, 330 (1995).  This court can only determine whether there is any evidence, if accepted as credible by the jury, that is sufficient to sustain the conviction.  *See Id*. Petitioner's argument establishes by itself that there was evidence before the jury that he used a knife and a gun during commission of the offenses.  Where, as in this case, the question is one of

1  witness credibility, the finding of the jury carries the day.  *Bruce v. Terhune*, 376 F.3d 950, 957

2  (9th Cir. 2004).  Sufficient evidence supported the jury's verdict with respect to the deadly

3  weapon use enhancements.

4         E.     Cumulative Error

5        Petitioner claims that his conviction must be reversed because of cumulative error.

6  The combined effect of multiple trial errors may give rise to a due process violation if the trial

7  was rendered fundamentally unfair, even where each error considered individually would not

8  require reversal.  *Parle v. Runnels*, 505 F.3d 922, 927 (9th. Cir. 2007) (*citing Donnelly v.*

9  *DeChristoforo*, 416 U.S. 637, 643 (1974) and *Chambers v. Mississippi*, 410 U.S. 284, 290

10  (1973)).  The fundamental question in determining whether the combined effect of trial errors

11  violated a defendant's due process rights is whether the errors rendered the criminal defense 'far

12  less persuasive,' *Chambers*, 410 U.S. at 294, thereby having a 'substantial and injurious effect or

13  influence' on the jury's verdict.  *Parle*, 505 F.3d at 927 (*quoting Brecht*, 507 U.S. at 637).

14  Where no individual error rises to the level of a constitutional defect, however, nothing can

15  accumulate to the level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957

16  (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999).

17        Each alleged error has been examined and it has been concluded that there were

18  no errors of constitutional magnitude.  There can be no relief for petitioner's claim of cumulative

19  error.

20                IV.  CONCLUSION

21        For all the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

22  application for writ of habeas corpus be DENIED.

23        These findings and recommendations are submitted to the United States District

24  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

25  days after being served with these findings and recommendations, any party may file written

26  objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 24, 2009.

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

25